The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.



**/S/ RUSS KENDIG**

Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| JEFFREY S. BODKIN AND | ) | CASE NO. 10-64205 |
| DEBORAH L. BODKIN, | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtors. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT FOR PUBLICATION)** |
| | ) | |
| | ) | |

Chapter 13 trustee Toby L. Rosen ("Trustee") filed an objection to confirmation of Debtors' plan and also moved to dismiss their case for lack of good faith. The court conducted an evidentiary hearing on the objection and motion to dismiss on December 8, 2011. Following a post-hearing briefing schedule, the court took the matter under advisement.

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) and (O).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

1

# FACTS

For many years, Debtors enjoyed the American dream, primarily as a result of Mr. Bodkin's employment as the controller with Mullinax Ford, a car dealership. During his heyday, he earned approximately $100,000.00 per year. In 2009, Debtors were awakened to a shocking reality when Mr. Bodkin voluntarily quit his job and could not fully replace his income.

In early 2009, Mullinax, which is owned by AutoNation, began to restructure its operations. For Mr. Bodkin, it meant a sixty percent reduction in pay, although he had opportunities to earn back some of the lost income. This change, coupled with his unhappiness at Mullinax, resulted in Mr. Bodkin's admittedly rash decision to resign from Mullinax with no job prospect in sight.

Mr. Bodkin was employed with Mullinax for approximately twenty-two years, twelve of those as controller. Although he attended college, he did not obtain a degree. Mrs. Bodkin, on the other hand, has a college degree to teach music education. Unfortunately, she was unsuccessful in her attempts to become licensed as a teacher in Ohio. She is employed on a very limited basis as a substitute teacher. Debtors have no dependents.

At the time of his exodus, Debtors were paying two mortgages on their residence valued at $205,000.00. (Order Granting M. Setting Property Value, doc. 26.) Debtors built the house approximately eleven years ago. Initially, mortgage payments were approximately $1,400.00. After refinancing twice, the amount of debt on the home is approximately $240,000.00. The total of the mortgage payments, including escrow for real estate taxes and insurance, now approaches $2,000.00 per month. The second mortgage on the house is wholly unsecured and Debtors have proposed to strip the mortgage through the chapter 13 plan. Their first mortgage payment is approximately $1,731.00 per month, with escrow.

When Mr. Bodkin quit his job, Debtors had little to no savings. After receiving his last pay check from Mullinax, Debtors began withdrawing from his Mullinax 401(k) plan. He rolled over in excess of $90,000.00 from his 401(k). Over the course of the next six months, Debtors withdrew approximately $72,000.00[1] from the retirement funds. The retirement funds were exempt assets.

Although he searched for a job, he had little success. Approximately six months after quitting Mullinax, he obtained employment as a branch manager for Woodforest National Bank. His annual starting salary was $48,000.00, with a chance to earn $6,000.00 in bonuses. His base salary is now $51,000.00, with the same opportunity for

---

[1] This is the pre-tax amount withdrawn. Debtors received approximately $65,500.00.

2

bonuses. Per Debtors' Schedule I, his gross annual income is approximately $58,000.00.[2] After deductions, his monthly net income is $3,485.11. In addition to earning less money, Mr. Bodkin's new job is in Salem, Ohio, requiring an eighty mile per day roundtrip.

Debtors don't dispute that they initially did little to curb their expenses during Mr. Bodkin's unemployment. Based on Debtors' Exhibits 1-A to 1-D, Debtors were spending the following, on average, per month from March 2009 through September 2009:

| | |
|---|---|
| ATM Withdrawals | $275.00 |
| Cigars | $128.78 |
| DirecTV | $130.21 |
| Groceries | $674.70 |
| Lawn care and maintenance | $274.35[3] |
| Music expenses | $215.91 |
| Personal care | $ 53.88 |
| Pet care | $137.18 |
| Pool maintenance | $646.19 |
| Postage | $ 18.72 |
| Recreation | $ 67.81 |
| Home maintenance and repair | $102.60 |
| Restaurant | $501.56 |
| Walmart | $919.26 |
| Charity | $ 50.71 |
| Miscellaneous expenses | $256.86 |
| Unidentified checks | $732.13 |
| Car payments | $815.64 |
| AutoNation COBRA | $528.57 |
| Cell phone | $132.27 |
| Utilities | $515.80 |
| Auto fuel and repairs | $319.09 |
| Insurance | $185.82 |
| Medical | $400.05 |
| Securicom[4] | $ 34.08 |

---

[2] Clearly, $51,000.00 + $6,000.00 does not equal $58,000.00. The $1,000.00 difference is unexplained. No one disputes the income listed in Schedule I.

[3] The lawn care charges began in June 2009. There were no charges for March through May 2009, so this is an average for four months, not seven.

[4] Mr. Bodkin testified he paid for the security system annually, so the figure is a monthly breakdown for the year.

3

These figures show that, not including mortgage and credit card payments and minor miscellaneous expenses, Debtors were spending over $8,000.00 per month during Mr. Bodkin's unemployment. Without accounting for the lack of income, the budget was excessive.

Debtors did make efforts to reduce at least one of the car payments. When he left Mullinax, Mr. Bodkin had been driving a Ford Explorer at a cost of $610.00 per month. He down-sized to a Ford Focus, lowering his payment to $403.43 while also reducing his fuel costs. When Mrs. Bodkin's lease came due, and she needed a vehicle, they purchased a Ford Escape for approximately $24,000.00.[5] The payments on that car are $459.20 per month.

Debtors kept the ship from sinking until March 2010. At that time, they had nearly run out of money and turned to credit counseling for help. The credit counseling agency developed a plan where Debtors would pay $900.00 per month. Debtors made the first payment and knew they would not be able to maintain payments toward that plan. At that point, they sought bankruptcy advice.

Debtors filed a joint bankruptcy petition on September 30, 2010. The plan provides that Debtors will pay their first mortgage and both vehicles directly. The bulk of their plan payment is directed to the tax penalty from the early withdrawal of the retirement funds. Debtors withheld an amount sufficient to cover the tax on the early withdrawals, but failed to account for the penalties for the early withdrawal. Unsecured creditors are scheduled to receive a two percent dividend. Debtors are current on their plan payments.

Debtors' monthly expenses, as set forth on Schedule J, are unrealistic. The budget was developed without regard for the reality of their needs, but was created to make the plan work. Consequently, while Debtors show only $55.00 per month disposable income on Schedule J, their plan calls for payments of $270.00 per month. Their first mortgage alone comprises approximately forty-six percent of their monthly net income. The vehicle payments are approximately twenty-three percent. After secured debt payments, Debtors are left with $889.00 to meet all other monthly expenses, yet Debtors schedule these expenses at $1,090.02 in their budget.

## LAW AND ANALYSIS

Two matters are pending: Trustee's objection to confirmation and her motion to dismiss the case. Both are premised on a lack of good faith. Debtors contend they have not filed their case in bad faith, nor have they demonstrated a lack of good faith with their plan.

---

[5] The balance on the proof of claim is $28,295.44.

4

I.  **Objection to confirmation**

Confirmation requirements are found in 11 U.S.C. § 1325(a). Before a court can confirm a plan, it must find that the plan meets the enumerated conditions. For example, plans must be chapter 7 liquidation standards, as set forth in § 1325(a)(4). Under § 1325(a)(6), the plan must be feasible. Section 1325(a) also includes two good faith requirements. As set forth in § 1325(a)(3), the bankruptcy code requires that a plan must be "proposed in good faith and not by any means forbidden by law," while § 1325(a)(7) conditions confirmation on a court's finding that "the action of the debtor in filing the petition was in good faith."

Since the court can only approve plans which meet these requirements, a court has the ability to raise its concerns sua sponte even in the absence of an objection. *See, e.g.,* In re Tran, 2011 WL 3862010 (N.D. Cal. 2011) (reporter citation not yet available) (citing United Student Aid Funds v. Espinosa, 130 S.Ct. 1367, 1380-81 (2010)); In re Evans, 242 B.R. 407 (Bankr. S.D. Ohio 1999) (declining to approve plan that sought to discharge student loans without a finding of nondischargeability). The court exercises its inherent power in this case. While Trustee objected to confirmation of Debtors' plan under the good faith requirement of § 1325(a)(3), for the following reasons the court concludes that the facts introduced at the hearing demonstrate the lack of feasibility and the court will deny confirmation on the grounds that the plan fails to satisfy § 1325(a)(6).

Debtors have ably demonstrated their inability to fund this plan. While Debtors are current on their plan payments, they are not current on secured debt payments which the plan provides will be paid by Debtors directly to the secured creditors. Mr. Bodkin testified that at the time this case was filed, he was current on his first mortgage payment. However, the proof of claim filed by Chase Home Finance ("Chase") contains an arrearage claim for $5,360.96, representing three delinquent payments, late charges and inspection fees.[6]

According to Mr. Bodkin, he did not attempt to modify the first mortgage through the plan, but sought a modification on his own starting in June 2010. To work with him, Chase required the account to be delinquent. Different representations were made about the length the account had to be delinquent. When he filed bankruptcy, he had to start the process over. After a year and a half, he obtained a modification of the first mortgage. He testified that the first mortgage is now approximately $10.00 more per month but Chase is not requiring them to make up the *fourteen* month delinquency that exists on the account. Mr. Bodkin directly stated that Debtors had not saved money during this period, but had applied the funds to other expenses. The magnitude of this fact cannot be

---

[6] This court's form plan requires debtors who are more than two months delinquent to make mortgage payments through the chapter 13 trustee. It is not clear how Debtors escaped this requirement.

5

overstated. The house payment is forty-six percent of their budget. Debtors could not save anything while skipping out on forty-six percent of their payments for an extended period of time. This is utterly hopeless. The incomprehensibility of the proposed plan is further highlighted when realizing that the house and car payments total just a little less than seventy percent of the total budget. The plan is not merely unfeasible. It is a fantasy.

Mr. Bodkin also testified that post-petition, Debtors had fallen behind on vehicle loan payments. Although Debtors had brought Mrs. Bodkin's payment current, Mr. Bodkin's remains one month delinquent.

During the hearing, Trustee also pointed out that in August 2011, the Internal Revenue Service filed an amended claim increasing the amount owed from $9,451.00 to $13,887.82. Over the course of sixty months, this will require payment to increase an additional $74.00 per month without accounting for the Trustee's administrative fee.

The sum of these facts is a clear demonstration that Debtors plan is not workable. Not only are the payments insufficient to satisfy the claims that have been filed in this case, but Debtors have been unable to maintain their secured debt payments while making their plan payment. For over a year, Debtors have funded their household expenses with monies that should have been paid to Chase. Debtors are simply attempting to do too much with too little. Their schedules show that they have monthly disposable net income of $54.86 and their plan payment calls for them to contribute $270.00 monthly to the chapter 13 trustee. As a result, they are trying to "find" $215.00 each month to fund the plan. The plan is hopelessly unrealistic. The court finds the plan is not feasible and denies confirmation under 11 U.S.C. § 1325(a)(6).

II.     Motion to dismiss

Trustee also moves to dismiss the case as a bad faith filing under § 1307(c). Although not specifically identified in the statute, bad faith is cause for dismissal. Alt v. U.S. (In re Alt), 305 F.3d 413 (6th Cir. 2002). As movant, Trustee bears the burden to demonstrate Debtors' lack of good faith. Id. The court looks at the totality of the circumstances to ascertain whether the case was filed in good faith, or whether it is indicative of an attempt to abuse the bankruptcy system. Id. (citing Soc'y Nat'l Bank v. Barrett (In re Barrett), 964 F.2d 588, 591 (6th Cir. 1992) (other citations omitted)).

As the Sixth Circuit noted in Alt, the same factors which drive the determination of whether a plan was filed in good faith may also be material to the question of whether a petition was filed in good faith. Alt at 419-20. Those factors include (1) the debtor's income; (2) the debtor's living expenses; (3) the debtor's attorney's fees; (4) the expected duration of the Chapter 13 plan; (5) the sincerity with which the debtor has petitioned for relief under Chapter 13; (6) the debtor's potential for future earning; (7) any special circumstances, such as unusually high medical expenses; (8) the frequency with which

6

the debtor has sought relief before in bankruptcy; (9) the circumstances under which the debt was incurred; (10) the amount of payment offered by debtor as indicative of the debtor's sincerity to repay the debt; (11) the burden which administration would place on the trustee; (12) the statutorily-mandated policy that bankruptcy provides be construed liberally in favor of the debtor. Id. at 419 (citing Barrett 964 F.2d at 592).

While these are the typical standards, they are not exclusive. The Sixth Circuit also favorably cited factors utilized by the Seventh Circuit: 'the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.' Alt at 419 (citing In re Love, 957 F.2d 1350, 1357 (7th Cir. 1992) (other citations omitted)). Regardless of the actual factors employed, the Sixth Circuit states that a court is to be more stringent in dismissing a case for bad faith compared to finding a plan was filed in bad faith. Id.

Unquestionably, Debtors did not exercise sound judgment in the months after Mr. Bodkin voluntarily left his job. Even the debtors don't dispute this conclusion. Despite their exorbitant spending, there are several factors in their favor. First, they incurred little new unsecured debt during Mr. Bodkin's unemployment. They were paying on their credit card debt and not making new charges. When Mr. Bodkin needed another vehicle, he downsized to a smaller car, saving money on the monthly payment and transportation costs. On the other hand, considering Mrs. Bodkin's limited transportation needs, their decision to purchase a new SUV for her, at a cost of more than $25,000.00, is more troubling.

Second, during his unemployment, Debtors were spending exempt assets. Mr. Bodkin aptly recognized that they may have realized a greater personal benefit by filing at a different point in time and possibly saving his retirement funds.

Third, Debtors are living on less income and have greatly reduced their expenses. (On the flip side, the reduction has gone too far, proving unworkable.) As above-median debtors, they are committed to a plan of maximum duration. They have not petitioned for bankruptcy relief before. This case presents no particular administrative burden to Trustee. Outside of their unrealistic budget, there are no instances of a lack of forthrightness by Debtors. These facts evidence an absence of bad faith.

On the other hand, Trustee has raised valid points that support bad faith. During Mr. Bodkin's unemployment, Debtors were not merely overspending on one or two items, they were overspending in every single expense category. These included cigars, pool expenses, music expenses, dining out, groceries, and so forth. One may be permissible, two may pass muster, but excessive spending in multiple categories raises a foul odor. Trustee also correctly identifies that the failure to account for the early

7

withdrawal penalty on the 401(k) monies now forces the unsecured creditors to pay the taxes because Debtors' the disposable income paid into the plan mainly reduces the priority tax debt, leaving an estimated two percent for the unsecured creditors. If the tax debt were not included, unsecured creditors may receive a twenty percent dividend.

The court also finds Mrs. Bodkin's disincentive toward more gainful employment to be problematic. Based on Schedule I, it appears she substitute teaches an average of three days per month. Debtors have no dependents and it is not clear why she has not sought more hours, attempted to find substitute positions in another district, or sought employment outside of the school system. Her underemployment is unexplained.

The court finds that one of the key factors to consider is how Debtors are proposing to handle meshing their past poor decisions with their financial future. A confirmable plan can cure many ills. When Debtors have made mistakes, and are honestly attempting to make a fresh start, a plan can be a key factor in demonstrating that intent. Basically, a plan can be a mitigation offer for bad faith. Here, Debtors have presented no such plan.

Debtors have proposed to retain everything they have, pay their priority debt, and leave their unsecured creditors with little to no return. The plan is not feasible as it stands. Debtors have demonstrated that they cannot live within the meager budget they've proposed and have fallen behind on secured debt payments. Trustee testified that she's never seen a plan succeed where Debtors propose to spend forty-six percent of their income on their mortgage payment.

Debtors unrealistic expectations of their ability to manage the amount of debt they have on their current income is fatal. Debtors either need to increase their income or decrease their debt/expenses to make a plan work. As presently constituted, this case bears indicia of bad faith. However, the court recognizes it may be possible for Debtors to propose a plan that lessens these indicators. Depending on their choices, Debtors may be able to propose a confirmable plan that overcomes the shadow of their past bad choices. Consequently, the court will not rule on Trustee's motion to dismiss until it is presented with a new plan. Ruling on the motion to dismiss is abeyed pending Debtors' filing of a new plan.

An order will be entered immediately reflecting the decision of the Court.

# # #

**SERVICE LIST**

Mitchell A Machan
3810 Tuscarawas St W
Canton, OH 44708

Toby L Rosen
400 W Tuscarawas St
Charter One Bank Bldg
4th Floor
Canton, OH 44702

Jeffrey S. Bodkin
Deborah L. Bodkin
1221 Davis St., SW
Canton, OH 44706

9